**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

| | | |
|---|---|---|
| JOSEPH MRAZEK, | : | Civil Action No.: 13-1091(FLW) |
| Plaintiff, | : | **OPINION** |
| vs. | : | |
| STAFFORD TOWNSHIP, *et al.*, | : | |
| Defendants. | : | |

_____:

**WOLFSON, United States District Judge:**

This Court previously rendered a partial decision on a summary judgment motion filed by Defendants, Stafford Township ("Stafford Township") and its Police Chief, Joseph Giberson ("Chief Giberson") (collectively, "Defendants"), dismissing two of the four counts in the Complaint — the procedural and substantive due process claims — brought by officer-plaintiff Joseph Mrazek ("Plaintiff" or "Mrazek") in connection with the Stafford Township Police Department promotion process.[1] *See Mrazek v. Stafford Twp.*, No. CV 13-1091(FLW), 2016 WL 5417197 (D.N.J. Sept. 28, 2016). While the Court denied summary

_____

[1] Plaintiffs Drew Smith and David Levi McVey also filed a summary judgment motion in a separate, but related, case, and that motion was decided by the Court in the same Opinion. Specifically, this Court dismissed the due process claims in their entirety, the only causes of action asserted by these two plaintiffs against Defendants. Because their case has been dismissed, the instant Opinion does not concern Smith and McVey.

judgment on Mrazek's First Amendment retaliation (Count IV) and *Monell* claims (Count III), I directed the parties to submit supplemental briefing on the issue of Chief Giberson's qualified immunity and Stafford Township's *Monell* lability.

Now that the issues are fully briefed, for the reasons set forth below, Defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part. With respect to Count III, I find that Chief Giberson was not a "policymaker" for purposes of imposing liability on Stafford Township under *Monell*, and therefore, Stafford Township's motion for summary judgment on Count III is **GRANTED.** With respect to Count IV, I find that Plaintiff's Constitutional right to freedom of association based upon his union affiliation and activities had been "clearly established," such that Chief Giberson should have known that his alleged retaliatory conduct violated that right, and thus, Chief Giberson is not entitled to qualified immunity. Consequently, Chief Giberson's motion for summary judgment on Count IV is **DENIED**. Thus, the claim in Count IV against Chief Giberson, is the only remaining cause of action in this case that will proceed to trial.

## DISCUSSION

The underlying facts of this suit were recounted in this Court's previous opinion issued on September 28, 2016. *See Mrazek*, 2016 WL 5417197. I will incorporate my previous opinion herein and reference it when necessary. As a brief background, Officer Mrazek participated as a

candidate in a promotion process for appointment to the rank of sergeant in Stafford Township. That process included objective and subjective components. At the conclusion of the objective component, Mrazek had the highest score. Chief Giberson and other supervisory officers then participated in the subjective component of the exam, a roundtable discussion, and Mrazek ranked last in that portion. Based on his cumulative scores, Mrazek was not promoted, and indeed, Mrazek was never promoted after that exam process.

After failing to be promoted, Plaintiff filed a complaint, alleging that Defendants violated his procedural and substantive due process rights (which I dismissed in my previous Opinion), and retaliated against him in violation of his First Amendment rights. Initially, Mrazek claimed that the defendants retaliated against him based upon (1) his constitutionally-protected speech criticizing the former Mayor and Stafford Township; and (2) his union affiliation — both of which are First Amendment related claims. However, as noted in this Court's previous Opinion, Mrazek has abandoned his speech claims, and he is proceeding only on the claim that Defendants have allegedly retaliated against him in the promotion process based upon his union affiliation, which violates Plaintiff's First Amendment right to freely associate with a union.

Specifically, in Count IV of the Complaint, Plaintiff claims that Chief Giberson retaliated against him for his union-related activities by negatively influencing his scores in the promotion exam process, which

resulted in Plaintiff being passed over for promotion. In his defense, Chief Giberson argues he is entitled to qualified immunity. In Count III, Plaintiff claims Stafford Township is liable under *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978), for the retaliatory acts committed by Chief Giberson. However, in the previous motion, since neither party had adequately addressed whether Plaintiff's Constitutional right had been "clearly established" for purposes of qualified immunity, and whether Chief Giberson possessed "policymaking" authority in making promotion decisions for *Monell* purposes, I directed both parties to submit supplemental briefs. I will first turn to qualified immunity.

## I.     Qualified Immunity

In my previous Opinion, I found that Plaintiff established a *prima facie* claim of First Amendment retaliation: (1) Plaintiff's rights to associate with a union and his position as a Union President are protected under the First Amendment; (2) Chief Giberson's alleged failure to promote Plaintiff solely because of Plaintiff's union affiliation was sufficient to deter a person of ordinary firmness from exercising his Constitutional rights; and (3) Plaintiff met his initial burden of showing that his union association was a "substantial" or "motivating factor" in Chief Giberson's decision not to promote Plaintiff. *Mrazek*, 2016 WL 5417197, at *9-14. Despite Plaintiff establishing his *prima facie* case, Chief Giberson argues that he should be entitled to qualified immunity.

Qualified immunity shields government officials, in their performance of discretionary functions, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As a government official performing a discretionary function — administering a promotion examination for officers — Chief Giberson is entitled to qualified immunity *unless* Plaintiff "pleads facts showing (1) that [Chief Giberson] violated [Plaintiff's] statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow*, 457 U.S. at 818).

As to the first prong, this Court previously determined that Plaintiff enjoys a Constitutional right to associate with a union free from retaliation for his union affiliation. The Court further determined that a genuine issue of material fact exists as to whether Chief Giberson violated Plaintiff's right. Thus, to defeat the qualified immunity defense, Plaintiff must show that the specific Constitutional rights asserted by Plaintiff were "clearly established." *See Hunter v. Bryant*, 502 U.S. 224, 233 (1991) ("Qualified immunity is an affirmative defense for which the government official bears the burden of proof. . . . [Plaintiff], however, bears the burden of proving that the right which the defendants allegedly violated was clearly established at the time of their conduct . . . ." (citation omitted); *Hynson*

*By & Through Hynson v. City of Chester*, 827 F.2d 932, 935 (3d Cir. 1987). Accordingly, I now address that issue.

### A.    The "Clearly Established" Standard

At the outset, the parties have not disputed the manner in which this Court previously framed the "clearly established" right involved here: "whether Mrazek, as the Union President, had a clearly established constitutional right, at the time of the official conduct, to be free from retaliatory action taken because of his membership in the Union." *Mrazek*, 2016 WL 5417197, at *16. However, as a general matter, in assessing a "clearly established" right, "the right allegedly violated must be defined at the appropriate level of specificity." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). Notably, the Third Circuit's recent decisions — in the context of First Amendment claims — have narrowly framed the "clearly established" Constitutional right allegedly violated in those cases. *See, e.g.*, *Mirabella v. Villard*, 853 F.3d 641, 653 (3d Cir. Apr. 4, 2017); *Rossiter v. City of Philadelphia*, No. 16-1187, 2016 WL 7478494 (3d Cir. Dec. 29, 2016); *Zaloga v. Borough of Moosic*, 841 F.3d 170, 175 (3d Cir. 2016). In light of those recent cases, it is incumbent upon this Court to define the rights involved, here, at the appropriate level of specificity, and in retrospect, I find that the way it was defined in my previous Opinion is too broad.

To determine whether a right is clearly established, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer

that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202 (citation omitted); *accord Zaloga*, 841 F.3d at 175 ("To defeat qualified immunity, the right purportedly violated must be so clearly established that 'every reasonable official would have understood that what he is doing violates that right. . . . This 'clearly established' standard . . . ensur[es] that officials can reasonably . . . anticipate when their conduct may give rise to liability for damages.'" (emphasis omitted) (quoting *Reichle v. Howards*, 566 U.S. 658, 132 S.Ct. 2088, 2093 (2012) (internal quotation marks, citations, and alterations omitted))). "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (quoting *Wilson*, 526 U.S. at 614). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202 (citation omitted); *Zaloga*, 841 F.3d at 174.

While a strict factual correlation between applicable precedent and the challenged conduct is not required to determine whether a right is clearly established, the Third Circuit "require[s] some but not precise factual correspondence." *Bennis v. Gable*, 823 F.2d 723, 733 (3d Cir. 1987) (quoting *Three Mile Island v. Nuclear Reg. Comm'rs*, 747 F.2d 139 (3d Cir. 1984)). Simply put, the Third Circuit requires officials to "relate established law to analogous factual settings." *Id.* Importantly, the Third

Circuit has noted that "the absence of a previous decision from [its] court on the constitutionality of the conduct at issue is not dispositive," *Pro v. Donatucci*, 81 F.3d 1283, 1292 (3d Cir. 1996) (quoting *Bieregu v. Reno*, 59 F.3d 1445, 1459 (3d Cir. 1995) (internal citations omitted)), "but existing precedent must have placed the statutory or constitutional question beyond debate." *Zaloga*, 841 F.3d at 175 (quoting *al-Kidd*, 563 U.S. at 741 (citations omitted)). Thus, in light of pre-existing law, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

While in the first instance, to determine a "clearly established" right, "the right allegedly violated must be defined at the appropriate level of specificity," *Saucier*, 533 U.S. at 202 (quoting *Wilson*, 526 U.S. at 615); *see also Mirabella*, 853 F.3d at 653, nonetheless, it also must not be drawn with an "unduly narrow construction." *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 248 (3d Cir. 2016) (quoting *Estate of Lagano v. Bergen Cnty. Prosecutor's Office*, 769 F.3d 850, 859 (3d Cir. 2014)). Accordingly, the level of specificity with which this Court must frame the "clearly established" Constitutional right, here, will determine the contours of that right sufficient to provide reasonable officials with fair notice. *See Anderson*, 483 U.S. at 639 ("The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified").

Surely, a public employee enjoys the right to associate with a union "and he is protected by the First Amendment from retaliation for doing so." *Smith v. Arkansas State Highway Emp., Local 1315*, 441 U.S. 463, 465 (1979) (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 574–75 (1968); *Shelton v. Tucker*, 364 U.S. 479 (1960)). But, if the "clearly established" inquiry were "applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone" of the "clearly established" analysis. *Anderson*, 483 U.S. at 639. Indeed, public employees "would be able to convert the rule of qualified immunity that [the Supreme Court] cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* Hence, this Court must strike the balance between vindicating citizens' Constitutional rights with ensuring that public officials effectively perform their duties, and are able to "anticipate when their conduct may give rise to liability for damages." *Id.* (footnote omitted) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)).

Here, Chief Giberson was administering a promotion exam that included objective and subjective components. The specific retaliatory conduct that allegedly resulted in a Constitutional violation was Chief Giberson's alleged improper influence on the subjective component of the exam, due to Mrazek's union affiliation, which negatively impacted Mrazek's promotion process. Thus, to define the right simply as a right to be free from employment retaliation for Plaintiff's union association,

without considering Chief Giberson's conduct, is overly broad. Rather, the legal right must be viewed "in light of the specific context of the case," *see Saucier*, 553 U.S. at 201, and "in the light most favorable to the party asserting the injury." *Andrews v. Scuilli*, No. 15-3393, 853 F.3d 690, 2017 WL 1314882, at *3 n.8 (3d Cir. April 10, 2017) (internal citations omitted). In this regard, to ensure notice for public officials to effectively perform their duties, the alleged wrongful basis upon which officials make their promotion decisions is significant in the qualified immunity inquiry. *See Anderson*, 483 U.S. at 639; *Mirabella*, 853 F.3d at 648–49, 653.

Thus, my focus "here is whether it was clearly established that [Chief Giberson's allegedly negative influence on the promotions process based upon the officer's union affiliation] was retaliatory" in the context of a freedom of association claim. *See Mirabella*, 853 F.3d at 653 (citation omitted). Put differently, I define the legal right as whether a reasonable public official could have recognized that negatively influencing a police promotion process solely because of an officer candidate's union-related activities (resulting in his being passed over for a promotion) would violate the officer's First Amendment freedom to associate rights.

### B. The "Clearly Established" Right

I begin my analysis by considering the clearly established law at the time Chief Giberson allegedly violated Plaintiff's First Amendment rights — January 2013. It is well-accepted and long established that the First Amendment protects the freedom to associate. *See, e.g., Griswold v.*

*Connecticut*, 381 U.S. 479, 483 (1965) ("[F]reedom of association [i]s a peripheral First Amendment right."); *Nat'l Ass'n for Advancement of Colored People v. State of Ala.*, 357 U.S. 449, 462 (1958) ("This Court has recognized the . . . freedom to associate . . . ."). Even more specifically, here, "the First Amendment's freedom-of-association clause protects the right to join a union." *Carroll v. Clifford Twp.*, 625 F. App'x 43, 47 (3d Cir. 2015) (citing *Hobbs v. Hawkins*, 968 F.2d 471, 482 (5th Cir. 1992) (citing *Thomas v. Collins*, 323 U.S. 516, 532 (1945))).

Indeed, the freedom to associate "includes the right to express one's attitudes or philosophies by membership in a group or by affiliation with it or by other lawful means." *Griswold*, 381 U.S. at 483. In this regard, "[t]he First Amendment protects the right of an individual to speak freely, to advocate ideas, [and] to associate with others." *Smith*, 441 U.S. at 464; *Perna v. Twp. of Montclair*, 409 F. App'x 581, 583 (3d Cir. 2011) ("That an employee's right to pursue affiliation with a Union is protected by the First Amendment is beyond cavil" (citations omitted)). And, importantly, the First Amendment "protects the right of associations to engage in advocacy on behalf of their members." *Id.* (citing *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415 (1963); *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961)). In this context, association "is a form of expression of opinion," falling squarely within the bundle of First Amendment rights. *Griswold*, 381 U.S. at 483; *Marshall v. Allen*, 984 F.2d 787, 800 (7th Cir. 1993) (explaining "the right to associate

'is cut from the same cloth' " as the other rights contained in the First Amendment"). Accordingly, "[t]he government is prohibited from infringing upon these guarantees." *Smith*, 441 U.S. at 464 (citing *Button*, 371 U.S. 415; *e. g.*, *Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Garrison v. Louisiana*, 379 U.S. 64 (1964)).

In the public employment context, the Third Circuit has clearly established the illegality of "retaliatory discharges, transfers, letters of reprimand, . . . demotions accompanied by transfers . . . , [and] demot[ions] . . . for [a public employee] exercising his rights under the first amendment." *Bennis*, 823 F.2d at 733 (footnote omitted). At the time of Chief Giberson's alleged conduct at issue here, the Third Circuit had applied the above retaliatory prohibitions to several exercises of First Amendment rights by public employees. *See, e.g.*, *Carroll v. Rochford*, 71 F. App'x 124, 126 n.2 (3d Cir. 2003) (noting that demoting, harassing, and terminating an employee for his political affiliation is unlawful under the First Amendment); *Burns v. Cnty. of Cambria, Pa.*, 971 F.2d 1015, 1025 (3d Cir. 1992) (holding that it was clearly established that public officials contravene the First Amendment when they fire an employee for his political support unless they can show that the particular position comes within the narrow *Pickering* exception); *Bennis*, 823 F.2d at 733 (concluding that the law is clearly established that a public employee cannot be demoted in retaliation for exercising his First Amendment right to associate for political purposes); *see also McGreevy v. Stroup*, 413 F.3d

359 (3d Cir. 2005) (finding that giving an employee a grossly unsatisfactory employment rating, then effectively terminating the employee for engaging in protected speech was a violation of clearly established law); *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000) (terminating employee and maliciously prosecuting employee for outspokenness on multicultural programs in the school district violated clearly established First Amendment law); *In re Montgomery Cnty.*, 215 F.3d 367 (3d Cir. 2000) (terminating a public employee in retaliation for speaking out against the County's allegedly racially discriminatory employment practices violated a clearly established right); *Pro,* 81 F.3d 1283 (finding it clearly established that a public employee has a First Amendment right to respond to a subpoena to appear in a proceeding without fear of retaliation); *Zamboni v. Stamler*, 847 F.2d 73, 79 n.7 (3d Cir. 1988) (finding that transferring and taking other disciplinary action against an employee for speech protected under *Pickering* is a First Amendment violation).

Accordingly, Third Circuit law clearly establishes that retaliatory employment action solely based on one's exercise of his or her First Amendment rights is unlawful in various circumstances. Furthermore, the right to freely associate with a union falls within the First Amendment. *See Carroll*, 71 F. App'x at 126 n.2; *Suppan v. Dadonna*, 203 F.3d 228, 237 (3d Cir. 2000). And, a failure to promote is an adverse employment decision similar to a demotion or transfer. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 74, 75 (1990) (likening promotion decisions to decisions

on dismissals and transfers as impermissible infringements on the First Amendment right of public employees when they are based on political affiliation or support).  However, since the Third Circuit has not yet squarely addressed the issue before this Court — whether negatively influencing a police promotion process because of an officer's union-related activities would violate the First Amendment's freedom to associate — I am required to "consider decisions by other Courts of Appeals as part of [my] 'clearly established' analysis." *Schmidt v. Creedon*, 639 F.3d 587, 598 (3d Cir. 2011) (quoting *Williams v. Bitner*, 455 F.3d 186, 192–93 (3d Cir. 2006)); *see also L.R.*, 836 F.3d at 248 ("[A] 'robust consensus of cases of persuasive authority' in the Court[s] of Appeals could clearly establish a right for purposes of qualified immunity" (quoting *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (quoting *Taylor v. Barkes*, ⸺ U.S. ⸺, 135 S.Ct. 2042, 2044 (2015) (per curiam)))).

The most analogous case to the facts here is *Zerman v. City of Strongsville, Ohio*, 259 F. App'x 723 (6th Cir. 2008), wherein firefighters for the City of Strongsville claimed, *inter alia*, that the fire chief, along with the city, wrongfully passed them over for a promotion because of their union activities and positions as union officers.  Plaintiff Zerman ranked first in the promotional examination, but after undergoing the interviewing portion of the exam, Zerman was passed over for promotion.[2]  *Zerman v.*

---

[2]     Here, too, Mrazek ranked first before beginning the roundtable portion of the promotion examination process.  *Mrazek*, 2016 WL 5417197,

*City of Strongsville, Ohio*, No. 1:04CV2493, 2006 WL 2812173, at *4 (N.D. Ohio Sept. 28, 2006), *aff'd*, 259 F. App'x 723 (6th Cir. 2008). The district court in *Zerman,* like here, found that there were genuine issues of material fact over whether Zerman was "passed over for promotion [b]ecause of [his] past union activities . . . . The perception [wa]s that [he was] a union troublemaker." *Id.* at *2 (internal quotations and citations omitted). Thus, the disputed issues of material fact precluded summary judgment on Zerman's freedom of association retaliation claim.

Then, the *Zerman* trial court turned to the fire chief's qualified immunity argument and found that the law was clearly established that a public employee cannot be denied a promotion solely because of his union activity:

> [T]he Sixth Circuit's statement, more than twenty years ago, demonstrates the . . . clearly established right:
>
> > We have *no doubt* that an employee who is disciplined solely in retaliation for his membership in and support of a union states a valid first amendment claim under *Connick* and *Pickering.*

*Id.* at *16 (emphasis original) (quoting *Boals v. Gray*, 775 F.2d 686, 693 (6th Cir. 1985) (citing *Grossart v. Dinaso,* 758 F.2d 1221, 1230 n.12 (7th Cir. 1985); *Prof'l Ass'n of Coll. Educators (PACE) v. El Paso Cnty. Cmty. Coll. Dist.*, 730 F.2d 258, 262–63 (5th Cir. 1984))). On appeal, the Sixth Circuit

---

at *12. Furthermore, there no in-person interviews were conducted during the subjective component of Mrazek's promotional exam.

affirmed "the district court's well-reasoned opinion [that] support[ed] the denial of qualified immunity and that the issuance of a detailed written opinion from [the circuit] would be repetitious." *Zerman*, 259 F. App'x at 724.

Similarly, the Fifth Circuit, in *Boddie v. City of Columbus, Miss.*, 989 F.2d 745, (5th Cir. 1993), was concerned with "no more than associational activity," *Id.* at 750, when a fireman alleged he was fired simply "because he associated with union members." *Id.* at 748. At trial, the "jury found that firing Boddie [did in fact] violate[] his right to freedom of association." *Id.* at 747. The court rejected the fire chief's defense — that Boddie was fired "on the basis of [his] poor attitude" — and was "persuaded that in 1987 it was clear that the First Amendment protects an employee's right to associate with a union." *Id.* at 748, 750. Therefore, the *Boddie* court "conclude[d] that [the fire chief] should reasonably have known that firing Boddie for his association with union firemen violated clearly established law." *Id.* at 750. Having found the fire chief violated clearly established law, the court rejected the fire chief's defense of qualified immunity. *Id.*

Likewise, the Tenth Circuit, in *Shrum v. City of Coweta, Okla.*, 449 F.3d 1132 (10th Cir. 2006), held that it was unconstitutional to retaliate against an employee for his union association. In *Shrum*, a police-officer plaintiff claimed that the chief of police and the city violated his freedom of association, among other claims, by retaliating against him for his membership in the labor union. *Id.* at 1134–35. There, the retaliatory

action consisted of rearranging the police officer's work schedule to cause conflicts with his duties as a church minister. *Id.* at 1134. Shrum had previously arranged with the police department to have "Wednesday evenings and Sundays off, so that he could continue to carry out his ministerial duties." *Id.* at 1135. However, after another officer was promoted to chief of police and after a dispute over Shrum's collective bargaining rights, he was "[f]orced to choose between his police and his ministerial responsibilities, [and subsequently Shrum] resigned from the police department and filed . . . [ ]suit." *Id.* at 1134. Ultimately, the court held that "[n]ot only does the First Amendment freedom of association protect public employees from retaliation for participation in a union  . . . , but as this Court held in *Morfin* [*v. Albuquerque Pub. Sch.*], 906 F.2d [1434,] 1439 [(10th Cir. 1990)], '[t]he unconstitutionality of retaliating against an employee for participating in a union [is] clearly established.'" *Shrum*, 449 F.3d at 1139 (internal citation omitted); *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 466 (10th Cir. 2013) (discussing, in the context of qualified immunity, that a police officer's "First Amendment right to associate with a union was  . . . clearly established"). Accordingly, the Tenth Circuit affirmed the district court's denial of summary judgment and held the chief was not entitled to qualified immunity.

Indeed, the Supreme Court has clearly established that a public employee cannot be faced with adverse employment action, *i.e.*, being passed over for a promotion, solely for exercising his or her right to freely

associate (unless that association interferes or disrupts the administration of a public duty); but most of these cases "revolve around an employee's right to associate in order to express political ideas through a union." *Marshall v. Allen*, 984 F.2d 787, 799 (7th Cir. 1993); *see e.g.*, *Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976). While there are few cases that provide a "precise factual correspondence" to the facts of the instant matter, the cumulative precedent does, however, show that the contours of the right to freely associate with a union are beyond debate: a reasonable officer should comprehend the unlawfulness of basing promotion decisions of another officer solely on his association with a union. *Cf. Carroll*, 71 F. App'x at 126 n.2 ("It is reasonable to conclude that a reasonable officer would comprehend the unlawfulness of basing any hiring decision of a public employee on party affiliation and support when party affiliation is not a requirement for the position").

Lastly, notwithstanding this body of clearly established law, the Third Circuit's decision in *Rossiter*, 2016 WL 7478494, is noteworthy because it presented a similar freedom of association issue involving a union, albeit with discernibly different factual circumstances from this case. The *Rossiter* case involved a dispute between the local police labor union and Police Commissioner. *Id.* at *1. Without approval from the police union, the police commissioner implemented a new disciplinary code. *Id.* The police union responded with a complaint to the Pennsylvania Labor Relations Board, arguing that the disciplinary code must be

negotiated prior to its implementation, and asserting unfair labor practices. *Id.* As the police department and labor union were working to resolve the dispute over the disciplinary code, the police department was separately dealing with plaintiff-officer Rossiter for another disciplinary action. *Id.*

Eventually, the police department offered to resolve Rossiter's disciplinary action if the labor union withdrew its unfair labor practices complaint. *Id.* at *2. When the union refused to withdraw its complaint, Rossiter was suspended and subsequently terminated. *Id.* Rossiter brought, *inter alia*, a First Amendment retaliation claim against the police commissioner, and the commissioner claimed qualified immunity. As to the question of "clearly established" right, the Third Circuit framed its inquiry as "whether there is an established right of [an] employee in a pending disciplinary proceeding to associate passively with a union whose representatives oppose internal policies." *Id.* at *3. In deciding that defendant was entitled to qualified immunity, the *Rossiter* court held that there was "no consensus of authority that leveraging a claim against a specific union member facing good faith disciplinary action in an effort to settle internal police affairs implicates a clearly established constitutional right." *Id.* at *5.

Here, by contrast, there is no disciplinary proceeding, nor a negotiation over unfair labor practices, nor any other ancillary dispute; the alleged retaliation in this matter is purely based on Plaintiff's union

association and his position as Union President.  Contrary to Chief Giberson's position, *Rossiter* did not deal with the type of Constitutional issue involved in this case — negatively influencing a promotions process for an officer, who was otherwise qualified to be promoted, solely because of his union association.

Chief Giberson also urges this Court to look to *Killion v. Coffey*, No. 13-1808, 2016 WL 5417193 (D.N.J. Sept. 27, 2016), for guidance. According to Chief Giberson, the *Killion* court found that Plaintiff's right to be free from retaliation for his union association was not clearly established.  I disagree.  In *Killion*, plaintiffs' claims were not based on union association, but rather on speech related claims.  In fact, the *Killion* court found that plaintiffs "repackage[d] [their] freedom of speech claims as freedom of association claims," and that plaintiffs' "allegations d[id] not support a claim for freedom of association." *Id.* at *7.  Hence, the court found "that Plaintiffs' freedom of association claim is 'barely an extension' of their freedom of speech claim." *Id.* (citing *Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008)).  The *Killion* court further explained that "Plaintiffs' claims fail because Plaintiffs have not adequately pled constitutionally protected activity or the requisite causal link between their conduct and Defendants' alleged retaliation." *Id.* at *16. Nonetheless, out of "an abundance of caution" the court addressed the issue of whether defendant was entitled to qualified immunity. *Id.*  In

addressing the "clearly established" prong of qualified immunity, the court framed its inquiry as

> whether a police officer's *conduct or speech* in support of the implementation of twelve hour shifts is an exercise of a clearly established constitutional right, such that it would have been clear to the Defendants that their alleged retaliation for that conduct . . . or their failure to investigate such retaliation . . . was unlawful.

*Id.* at \*17 (emphasis added). Importantly, the court's inquiry was unrelated to a right to associate with a union. While the court found "[i]t would not have been clear to a reasonable officer . . . that the Plaintiffs were exercising any clearly established First Amendment rights," *id.*, the court's holding that defendant was entitled to qualified immunity is not analogous to the issue before this Court, *i.e.*, freedom to associate.

Moreover, Chief Giberson's citation to other *speech* cases, without further explication is not persuasive. *See, e.g.*, *Morris v. Philadelphia Hous. Auth.*, 487 F. App'x 37 (3d Cir. 2012) (finding that because a city housing authority employee's statements were not protected speech, the court need not reach the question of qualified immunity); *Beresford v. Wall Twp. Bd. of Educ.*, No. No. 08-2236, 2010 WL 445684 (D.N.J. Feb. 3, 2010) (finding that statements made in a Union President's official capacity regarding raises, sick days, and overtime during union contract negotiations were not protected speech); *Rodriguez v. Torres*, 60 F. Supp. 2d 334 (D.N.J. 1999) (finding that first, factual issues precluded summary judgment on plaintiff's First Amendment retaliation claim involving harassment, but

providing defendant with qualified immunity because the court could not say it was clearly established that the creation of a *hostile work environment* would violate plaintiff's mixed speech and association rights under the First Amendment, and second, importantly, the court permitted plaintiff's First Amendment retaliation claim based on a failure to promote to proceed to trial.); *see also Killion*, 2016 WL 5417193, at *16–*17.  In short, Chief Giberson fails to provide analogous precedent to the Constitutional rights implicated in this case: (1) being passed over for a promotion (2) because of union-activities.

Finally, Chief Giberson also attempts to relitigate his summary judgment motion, arguing that Plaintiff's position as Union President was not discussed during the roundtable portion of the promotion process. However, this Court has already found a genuine issue of material fact exists as to the roundtable discussions and their import, and whether Chief Giberson retaliated against Mrazek because of his union affiliation. *See Mrazek*, 2016 WL 5417197, at *9–15.  I will not revisit that issue here.

In sum, clearly established law provides a public employee the right to join a union and prohibits retaliatory employment action — such as passing over a public employee for a promotion — for exercising his or her First Amendment right to associate.  To hold otherwise would render the right to join a union a hollow exercise.[3]  Therefore, "[w]hen the balance of

---

[3]  As the Supreme Court suggested in *dictum*, if the government had "tak[en] steps to prohibit or discourage union membership or association,"

cognizable interests weighs . . . in an employee's favor, our cases make plain that the law is clearly established." *Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 994 (3d Cir. 2014) (quoting *McGreevy*, 413 F.3d at 367).

## II.   *MONELL* LIABILITY

Count III of Mrazek's Complaint asserts a § 1983 *Monell* claim against Stafford Township.   Mrazek alleges that Stafford Township, through Chief Giberson, retaliated against him for engaging in union activities, which subsequently resulted in Plaintiff being passed over for a promotion.   Mrazek contends that Chief Giberson is the final "policymaker" for the Police Department, an administrative arm of the municipality, and therefore, Chief Giberson's retaliatory decision "against Mrazek on the account of his union membership constitutes an unwritten policy." *Mrazek*, 2016 WL 5417197, at *16.   In response, "Defendants contend that Mrazek may not premise his *Monell* claim based upon the act of the Township's employee, *i.e.*, Chief Giberson; rather, Defendants maintain

---

*Smith*, 441 U.S. at 466, it would be unlawful. *see Rossiter,* 2016 WL 7478494, at *4; *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited" (citation omitted)). Here, Chief Giberson allegedly influenced the promotion process based upon Plaintiff's union affiliation and this allegedly resulted in the failure to promote Plaintiff.   Such conduct is precisely the type of governmental action that discourages union membership and taking on a leadership role within a union.

that Mrazek must identify a policy or custom of the Township itself that caused him injuries." *Id.* I asked the parties to submit additional briefing to address whether Chief Giberson's promotion decisions as to Mrazek can bind Stafford Township under *Monell*.

Under § 1983, to hold a municipality liable for a Constitutional wrong, the alleged violation must be the result of an official policy or custom. *Monell*, 436 U.S. at 694; *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996). "A policy may be made only when a policymaker issues an official proclamation or decision." *Hernandez v. Borough of Palisades Park Police Dep't*, 83 F. App'x 909, 912 (3d Cir. 2003) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted)). Whereas, "[a] custom may exist where the relevant practice is so permanent and 'widespread as to have the force of law.'" *Hernandez*, 83 F. App'x at 912 (quoting *Bryan Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).

Generally, there are three scenarios in which a municipality may be liable for the torts of its employees under *Monell*:

1. If a municipality's employee acts "pursuant to a formal government policy or a standard operating procedure long accepted within the government entity;"

2. "[W]hen the individual has policy making authority rendering his or her behavior an act of official government policy;" and

3. "[I]f an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes."

*McGreevy*, 413 F.3d at 368 (citing *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986) (plurality opinion); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  Because Plaintiff has premised his claim on a single decision, this Court's Opinion focuses only on the second scenario.

Of course, "not every decision by municipal officers automatically subjects the municipality to § 1983 liability."  *Pembaur*, 475 U.S. at 481.  In essence, such a rule would be akin to *respondeat superior*.  And, "[g]overnmental liability under § 1983 may not attach merely by operation of *respondeat superior*" because a decisionmaking officer violates a policy. *Marable v. W. Pottsgrove Twp.*, 176 F. App'x 275, 283 (3d Cir. 2006) (citing *Monell*, 436 U.S. at 691); *Simmons v. City of Phila.*, 947 F.2d 1042, 1060 (3d Cir. 1991).  Indeed, "[t]he fact that a particular official — even a policymaking official — has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."  *Pembaur*, 475 U.S. at 481–82.

Rather, where the alleged violation results from a single decision, "a municipality generally may incur *Monell* liability only where the decisionmaker is a municipal 'policymaker.'"  *Marable*, 176 F. App'x at 283 (citing *Pembaur*, 475 U.S. at 481–82).  More specifically, "only where the decisionmaker possesses *final authority* to establish municipal policy with respect to the action ordered" does municipal liability attach.  *Pembaur*,

475 U.S. at 481 (emphasis added). In other words, to attach government liability under *Monell*, the alleged Constitutional violation must be considered an official action taken by the municipality through an individual that has final policymaking authority. *Id.* at 483.

To determine whether an official "has final policy-making authority, and can thus bind the municipality by his conduct," *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006), this Court must first determine whether "the official is responsible for making policy *in the particular area* of municipal business in question," *id.* (emphasis original) (citing *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997); *Praprotnik*, 485 U.S. 112), and, second, "whether the official's authority to make policy in that area is *final and unreviewable*." *Id.* (emphasis original) (citing *Praprotnik*, 485 U.S. 112; *Pembaur*, 475 U.S. at 483; *McGreevy*, 413 F.3d at 369; *Brennan v. Norton*, 350 F.3d 399, 428 (3d Cir. 2003)). Importantly, "if a municipal employee's decision is subject to review, even discretionary review, it is not final and that employee is therefore not a policymaker for purposes of imposing municipal liability under § 1983." *Brennan*, 350 F.3d at 428 (citation omitted).

Due to the "extremely wide latitude [states have] in determining the form that local government takes," *Praprotnik*, 485 U.S. at 124, whether an official is vested with "final policymaking authority is a question of state law." *Pembaur*, 475 U.S. at 483. Accordingly, in determining whether Chief Giberson had final policymaking authority, this Court must look to

state law and local ordinances and regulations governing Stafford Township's police department.  *See Praprotnik*, 485 U.S. at 125.

To begin, Mrazek points to N.J.S.A. 40A:14-118, known as the Chief's Bill of Rights, and argues that Chief Giberson is "vested with authority to oversee the day-to-day activities in the police department through [this statute]."  Pl.'s Br. 2.   While Mrazek is correct that this statute provides Chief Giberson with authority over "routine day to day operations," *id.*; *accord Hernandez*, 83 F. App'x at 913 (explaining the chief of police is the final policymaker for "personnel *functions* and *operations*" and in setting "administrative policies of the department" (emphasis added)), his assertion that Chief Giberson has authority "to make policy" with respect to promotions or promotion decisions is erroneous.  *See* Pl.'s Br. 2–3.  As Mrazek relies heavily on this statute, this Court will quote the law in its entirety:

> The *governing body of any municipality*, by ordinance, may create and establish, as an executive and enforcement function of municipal government, a police force, whether as a department or as a division, bureau or other agency thereof, and provide for the maintenance, regulation and control thereof.  Any such ordinance shall, in a manner consistent with the form of government adopted by the municipality and with general law, provide for a line of authority relating to the police function and for the adoption and promulgation by the appropriate authority of rules and regulations for the government of the force and for the discipline of its members. The ordinance may provide for the appointment of a chief of police and such members, officers and personnel as shall be deemed necessary, the determination of their terms of office, the fixing of their compensation and the prescription of their powers, functions and duties, all as *the governing body* shall deem necessary for the effective government of the force.  Any

such ordinance, or rules and regulations, shall provide that the *chief of police, if such position is established, shall be the head of the police force and that he shall be directly responsible to the appropriate authority* for the efficiency and routine day to day operations thereof, and that he shall, *pursuant to policies established by the appropriate authority*:

a.    Administer and enforce rules and regulations and special emergency directives for the disposition and discipline of the force and its officers and personnel;

b.    Have, exercise, and discharge the functions, powers and duties of the force;

c.    Prescribe the duties and assignments of all subordinates and other personnel;

d.    Delegate such of his authority as he may deem necessary for the efficient operation of the force to be exercised under his direction and supervision; and

e.    *Report at least monthly to the appropriate authority in such form as shall be prescribed by such authority on the operation of the force during the preceding month, and make such other reports as may be requested by such authority.*

As used in this section, *"appropriate authority"* means the mayor, manager, or such other appropriate executive or administrative officer, such as a full-time director of public safety, or the governing body or any designated committee or member thereof, or any municipal board or commission established by ordinance for such purposes, as shall be provided by ordinance in a manner consistent with the degree of separation of executive and administrative powers from the legislative powers provided for in the charter or form of government either adopted by the municipality or under which the governing body operates.

Except as provided herein, the municipal governing body and individual members thereof shall act in all matters relating to the police function in the municipality as a body, or through the appropriate authority if other than the governing body.

> Nothing herein contained shall prevent the appointment by the governing body of committees or commissions to conduct investigations of the operation of the police force, and the delegation to such committees or commissions of such powers of inquiry as the governing body deems necessary or to conduct such hearing or investigation authorized by law. Nothing herein contained shall prevent the appropriate authority, or any executive or administrative officer charged with the general administrative responsibilities within the municipality, from examining at any time the operations of the police force or the performance of any officer or member thereof. In addition, nothing herein contained shall infringe on or limit the power or duty of the appropriate authority to act to provide for the health, safety or welfare of the municipality in an emergency situation through special emergency directives.

N.J.S.A. 40A:14-118 (emphasis added). Nowhere in the statute is there a scintilla of "final and unreviewable" authority delegated to any chief of police, let alone Chief Giberson, to make employment related policy or decisions — specifically, promotions. *See Santiago v. City of Vineland*, 107 F. Supp. 2d 512, 540 (D.N.J. 2000). In fact, the chief of police acts "pursuant to policies established by the appropriate authority," and the chief of police is required to provide monthly reports to the "appropriate authority," which is defined by the statute as "the mayor, manager, or such other appropriate executive or administrative officer, such as a full-time director of public safety . . . ." N.J.S.A. 40A:14-118; *see Santiago*, 107 F. Supp. 2d at 540. Thus, New Jersey's "Chief's Bill of Rights" does not confer "final and unreviewable" authority to Chief Giberson to make policy or decisions in the particular context of promoting officers.

Moreover, both parties agree that the promotion policy related to Mrazek's alleged Constitutional injury must be approved, adopted, and

incorporated in the Township Code by way of a Resolution. While Chief Giberson may have written the promotion policy and played a "major role" in developing the policy, it is clear that his authority was *not* "final and unreviewable." Additionally, neither promoting officers nor drafting a new promotion policy qualify as "routine day to day operations" as enumerated in New Jersey's "Chief's Bill of Rights" statute. *See* N.J.S.A. 40A:14-118(a)-(e). These particular actions are always subject to the parameters established by Stafford Township. *See id.*; *accord* Stafford Township Code §§ 41-3A, 41-4A, 41-6A.

Fittingly, the Supreme Court in *Pembaur* discussed an analogous example to the instant facts. There, the Court noted:

> the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions *would* represent county policy and could give rise to municipal liability.

*Pembaur*, 475 U.S. at 484 n.12 (emphasis original). Under this guidance, the only other way that Chief Giberson's decisions involving promotions can give rise to municipal liability is where final employment power is

delegated to him by Stafford Township. Accordingly, this Court must look to Stafford Township's Administrative Code to determine whether Chief Giberson was delegated the authority to make promotion decisions without municipal review.

Mrazek argues that "the policies and ordinances of the Township of Stafford" provide Chief Giberson with policymaking authority in the context of promotions. However, Mrazek fails to provide, or cite to, the relevant Township policies and ordinances that confer *this specific authority*. Rather, the policies and ordinances of Stafford Township cited by Mrazek actually support Stafford Township's position.

First, Stafford Township Code provides that Chief Giberson's promotion policy and subsequent decisions to promote specific officers are subject to approval by the Township Council. Indeed, Stafford Township's Code provides that the chief of police, similar to N.J.S.A. 40A:14-118, acts "pursuant to the policies established by the appropriate authority" and reports back to the appropriate authority regularly. *See* Stafford Township Code § 41-3A. Further, "[a]ll police officers, without regard to rank, shall be appointed by the Township Council by resolution. All promotions within the Department shall be *made by the Township Council* by resolution." *Id.* § 41-4A (emphasis added). Similarly, when new "[r]ules and regulations [are adopted] for the efficient operation of the Police Department[, those rules and regulations] shall be recommended by the appropriate authority and *submitted to the Township Council for adoption*

*by resolution. . . .* The rules and regulations may be amended at any time *by the Township Council by the adoption of a resolution* setting forth any amendments or additions to the police rules and regulations." *Id.* § 41-6A (emphasis added). Pursuant to these municipal provisions, Chief Giberson's promotion policy and all of Chief Giberson's selections for promotion needed to be reviewed and subsequently adopted through resolutions by the *Township Council.* Indeed, Stafford Township followed this very protocol in promoting its officers by way of resolution, *see, e.g.,* Stafford Township Resolution 2013-148; Stafford Township Resolution 2013-187; Stafford Township Resolution 2014-175; Stafford Township Resolution 2016-111, and amending its promotion policy by way of resolution, *see, e.g.*, Stafford Township Resolution 2016-103.

Mrazek also contends that several cases illustrate that a chief of police has policymaking authority in the context of promotions. However, Mrazek relies on cases that tend to show that the chief has policymaking authority in other contexts (and in other municipalities with their own respective and different policies and procedures). For example, Mrazek argues that *Hernandez v. Borough of Palisades*, 83 F. App'x 909 (3d Cir. 2003) and *Black v. Stephens*, 662 F.2d 181 (3d Cir. 1981), support Chief Giberson having policymaking authority. But, Mrazek misses the point, because neither case deals with policymaking authority "*in the particular area* of municipal business in question." *Hill*, 455 F.3d at 245 (emphasis original) (citation omitted). In *Hernandez*, the court explained that the

chief of police, there, was the final policymaker for "personnel *functions* and *operations*" and in setting "administrative policies of the department." *Hernandez*, 83 F. App'x at 913 (emphasis added). In *Black*, the court explained that because the chief "wrote and implemented an official police regulation concerning disciplinary hearings" and was a "member of the Mayor's cabinet, [where he] propose[d] and manage[d] the budget and establishe[d] policies and procedures for the entire police department," his actions constituted an official act of policy with respect to investigating complaints, disciplining officers, and encouraging excessive force. *Black*, 662 F.2d at 189–91. As such, these distinguishable cases do not support Plaintiff's position here.

Additionally, Mrazek's reliance on *Hines v. Albany Police Dep't*, 520 F. App'x 5 (2d Cir. 2013) and *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir. 1990) is similarly misplaced. *Hines* involved a search and seizure police policy, which that court found was a policy for which the chief of police was responsible for providing final oversight. *See Hines*, 520 F. App'x 5, at *2. In *Andrews*, the police commissioner was a policymaker in the context of sexual discrimination because the commissioner "promulgated and disseminated a police department training manual and a course outline explaining the prohibitions against sexual harassment and discrimination." *Andrews*, 895 F.2d at 1481. Moreover, the commissioner "also set up a division, the Equal Employment Office, to deal with problems of discrimination and *he personally reviewed*

the [Internal Affairs Division] report issued in th[e] case." *Id.* As such, the Third Circuit found "that, at the least, [the commissioner] 'retained the authority to measure'" the conduct in issue. *Id.* Thus, the cases Mrazek relies upon do not no bear on Chief Giberson's authority with respect to promoting officers in Stafford Township.

Finally, Mrazek's argument that Chief Giberson was the "issuing authority" for the promotion policy and played a "major role" in developing the policy does not carry the day. As discussed above, the municipality retained the authority to review, adopt, and amend the promotion policy. That the policy was adopted in full does not somehow relinquish Stafford Township's authority to review the promotion policy. Nevertheless, Plaintiff argues that this was a case of township acquiescence. Plaintiff reasons that even if Stafford Township could have disapproved Chief Giberson's promotion decisions, they effectively gave the Chief unfettered "power" to make all promotion decisions. Pl. Supp. Br., p. 7. For support, Plaintiff points to a New Jersey Supreme Court decision, *Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist.*, 201 N.J. 544 (2010), which, on its facts is not helpful to Plaintiff's position. More importantly, Plaintiff has not cited to any Third Circuit case law that has endorsed this theory of acquiescence in the *Monell* context.

In *Besler*, the plaintiff alleged that his First Amendment right to free speech was violated when a school board president stopped him from completing a statement regarding a coach's verbally abusive demeanor.

*Id.* at 555-56. While the president was not endowed with final decision-making authority on all board-related issues, the Court found that the board members, who were also present when the president allegedly stifled plaintiff's speech, acquiesced in the decision to silence the plaintiff. *Id.* at 568. However, in making this determination, the Court found dispositive that the board members were aware of the purported wrongful conduct (indeed, the board members were present at the time the alleged unconstitutional act was committed in *Besler*) and that such awareness must be shown before acquiescence can be established. *Id.* at 567. Here, nothing in the record indicates that either the Mayor or Township Council was aware of Chief Giberson's alleged retaliatory animus during Mrazek's promotion process. Moreover, Plaintiff has not presented any evidence to show that Stafford Township somehow empowered Chief Giberson to make all promotion decisions without any oversight. Rather, Plaintiff maintains — in a conclusory manner in his brief, without citations to anything in the record — that merely because Chief Giberson drafted and recommended the promotion exam and its policy to the Township Council, which were then adopted by the Council without change, the Council must have provided the Chief with unchecked power to make any and all promotion decisions, including which candidates to promote to the rank of sergeant. Glaringly, however, Plaintiff points to no evidence in the record to support his theory, and discovery has concluded.

Moreover, the promotion policy is not the proximate cause of Mrazek's alleged injury. Rather, Mrazek's alleged injury results from Chief Giberson's decision not to recommend Mrazek for promotion. Although Mrazek argues that Chief Giberson also heard exam score appeals, as this Court has already concluded, Chief Giberson's authority to recommend officers for promotion is subject to review, and therefore, not final. *See Brennan*, 350 F.3d at 428; *e.g.*, Stafford Township Resolution 2013-148; Stafford Township Resolution 2013-187; Stafford Township Resolution 2014-175; Stafford Township Resolution 2016-111.

Ultimately, Plaintiff fails to meet his burden to show that the Mayor or Township Council played *any* role in, or were even aware of, the alleged retaliatory behavior on the part of Chief Giberson. And, there is no evidence in the record that the municipality delegated any of its policymaking authority with regard to promoting officers to Chief Giberson by acquiescence or otherwise. Insofar as Chief Giberson's alleged retaliatory conduct against Mrazek constituted an unofficial policy against union activities, it is in contravention of Stafford Township's established policy.[4] Plaintiff's theory of liability is, instead, akin to *respondeat superior*

---

[4]    Additionally, Stafford Township's policy is not inconsistent with its collective bargaining agreement with Stafford Township Local 297 Policeman's Benevolent Association, the Union wherein Mrazek was President. *See* Def.'s Br. Ex. L and M (providing in Article IX that "Nothing in this Agreement shall interfere with the right of the Employer[, defined as the "Township of Stafford",] in accordance with the applicable statutes, ordinances, rules and regulations to: . . . *promote* . . . employees in positions within the municipality . . . ." (emphasis added)).

because, without "final and unreviewable" authority, Chief Giberson was not a final policymaker with respect to promoting officers. Put differently, if Chief Giberson acted in violation of Mrazek's First Amendment rights, he did so personally — not in the manner in which the municipality would be responsible under *Monell*. *See Pembaur*, 475 U.S. at 480 ("*Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' — that is, acts which the municipality has officially sanctioned or ordered").

To conclude, Chief Giberson's discretionary decisions on whom to promote "are constrained by policies not of [his own] making, *those policies*, rather than [Chief Giberson's] departures from them, are the act of the municipality." *Praprotnik*, 485 U.S. at 127 (emphasis added). The final "policymaker" for promoting officers rests with Stafford Township, and as a result, Chief Giberson is not a "policymaker" for *Monell* purposes in the context of this case. *See Davison v. City of Minneapolis, Minn*, 490 F.3d 648, 660 (8th Cir. 2007) (explaining that although the Chief "had the authority to select particular individuals for promotion and even to design the procedures governing promotions within his department, this authority d[oes] not include responsibility for establishing substantive personnel policy governing the exercise of his authority" (citation omitted)); *Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 965 (4th Cir. 1995) (same).

**CONCLUSION**

For the above reasons, Defendants motion for summary judgment is **DENIED** in part and **GRANTED** in part. Chief Giberson is not entitled to qualified immunity and summary judgment on Count IV is denied. However, because Chief Giberson did not have final policymaking authority to make promotion decisions, Plaintiff's *Monell* claim fails; summary judgment on Count III is granted.


Dated: May 5, 2017                          /s/          Freda L. Wolfson
                                            Freda L. Wolfson
                                            United States District Judge